[No. 28288.   Department Two.   April 25, 1941.]

HIRAM M. COLWELL, *Respondent*, v. KENNETH G. NYGAARD, *Appellant*.[1]

[1]Reported in 112 P. (2d) 838.

*Snively & Bounds* and *Owen Clarke,* for appellant.

*E. K. Brown,* for respondent.

BEALS, J.—The plaintiff, Hiram M. Colwell, instituted two actions against Kenneth G. Nygaard, seeking recovery of damages suffered by reason of the death of plaintiff's minor daughter, Edith F. Colwell, who died January 3, 1940, as the result of injuries which she received four days previously, when she was struck by an automobile owned and operated by defendant. In one action plaintiff sued individually; in the other as administrator of his daughter's estate. The actions were heard together, and were tried to the court sitting without a jury, the court refusing to allow any recovery in favor of plaintiff as administrator, but entering findings of fact and conclusions of law in plaintiff's favor in the other action, followed by a judgment in plaintiff's favor in the sum of $1,862.50, from which judgment defendant has appealed.

Error is assigned upon the admission of the evidence of one witness, over appellant's objection; upon the denial of appellant's motion for a nonsuit; and upon the denial of appellant's challenge to the sufficiency of the evidence. Appellant also assigns error upon the refusal of the court to enter judgment in his favor; and upon the denial of his motion for a new trial.

No question concerning the denial by the trial court of the right of respondent as administrator to recover against appellant is presented on this appeal.

The facts of the case may be summarized as follows: Edith F. Colwell, of the age of eighteen years and ten months, was residing with her parents in or near the city of Ellensburg. She was an outstanding young woman, mentally and physically, a devoted daughter, and enjoyed the respect and affection of her associates. She was in attendance on the Central Washington College of Education, at Ellensburg.

About three o'clock, or a little later, on the afternoon of December 30, 1939, Miss Colwell and four of her girl friends were proceeding south along a road which extends north from the limits of the city of Ellensburg. The road sloped down toward the south at a grade varying from 2.78 to 4 per cent. The ground was covered with snow to a depth of from four to six inches, and the road along which the girls were walking had been cleared for traffic, both vehicular and pedestrian, to a width of from ten to twelve feet, leaving the snow undisturbed on both sides of the cleared roadway. The road was not paved, but had a hard surface, upon which remained some snow and ice, the snow being soft and slushy, the temperature being a little above freezing. The girls were walking along the roadway, five abreast, occupying practically all of the space between the undisturbed snow on either side. Their names and their positions in the line as they were walking south were as follows: Barbara DeGraves was on the east, or left, of the line, Nadine Cargo was next, Edith Colwell next, then Irma Klampher, and Helen Michaels on the extreme right. The afternoon was cloudy, but there was no precipitation, and the visibility was good.

The girls were walking leisurely, and in the course of time an automobile came along, to which they yielded the right of way, by withdrawing from the open portion of the road. They then resumed their

way, in the same order as before. Appellant's automobile then appeared upon the scene, coming from the north behind the girls, and proceeding south. When appellant was at least four hundred feet distant from the girls he saw them clearly, and they were aware of his approach, one of the girls remarking that a car was coming. Appellant, who had been driving at thirty miles an hour or a little more, when he approached the girls as near as approximately one hundred sixty feet, materially diminished his speed. At about this time, one of the girls again remarked that the automobile was coming closer.

As the car came within about eighty feet of the pedestrians, the two girls who were on the right of the line, the Misses Klampher and Michaels, stepped from the open roadway and walked in the snow on the westerly side of the road. Miss DeGraves, who was on the extreme left, also stepped into the snow and continued walking. This left Miss Cargo and Miss Colwell in the road, the latter in approximately the middle of the cleared roadway, Miss Cargo to her left in the easterly half of the road. Miss Cargo then left the road, proceeding to her left into the snow. Miss Colwell attempted to avoid the automobile, as found by the trial court, by moving rapidly forward and to her right, in a diagonal direction, toward the westerly margin of the road, but was struck by the right front bumper and fender of the car, suffering injuries from which she died a few days later.

The trial court found that the deceased, knowing of the near approach of the car, was negligent in remaining in the roadway, but that appellant had ample opportunity and the last clear chance to avoid striking her, and that, for this reason, appellant should be held to respond in damages.

Appellant and the girls were well acquainted, and

appellant was thoroughly familiar with the road and its then condition, having driven over it only a short time before the accident. The road was unoccupied, save for the girls and appellant's car.

Appellant stood upon his motion for a nonsuit and his challenge to the sufficiency of the evidence, introducing no evidence thereafter.

The open surface of the road was slippery, and there is in the record testimony to the effect that appellant's tires were smooth and that his brakes were not of the best.

Appellant was called as a witness by respondent, and testified at considerable length concerning the accident. He stated that he at no time gave any horn signal, testifying that he knew that the girls were aware of the approach of his car, as he saw at least two of them look back. He stated that he gradually reduced his speed, and at the time he struck Miss Colwell, was going at fifteen or sixteen miles per hour, along his right hand side of the road. Testifying as to what happened just prior to the accident, appellant stated that he saw Miss Cargo take Miss Colwell's hand, and with her start to their left, and that when he was within three or four feet of the two girls, Miss Colwell sprang back in front of his car, and was struck by the right hand side of the bumper and fell back over the right fender, falling to the side of the road within a very few feet from the place she was struck. Other testimony was to the effect that the girl was carried on the front of the car twenty-three feet or more.

Appellant testified that he applied his brakes some eight feet back of the point of collision, but his car skidded forward, and that he released his brakes after the girl fell to the ground. He stated that Miss Colwell was well to his left, in a position of safety, and that his

car would not have struck her had she not cut back to her right in front of the car.

The injured girl had no recollection whatever of the accident, nor of events which occurred immediately prior thereto.

The testimony of Nadine Cargo, who was walking along the road next to Miss Colwell, on the latter's left, is extremely important. After describing the commencement of the walk of the five girls down the road, the witness described the weather as above, stated that the cleared portion of the road was wide enough for the five to travel abreast without crowding, and that they were strolling leisurely along, being in no hurry. The witness was first aware of appellant's approach while his car was at a considerable distance, which she estimated at three hundred feet or more. She then described the departure from the road of the two girls on the right and the girl on the extreme left, leaving the witness and Miss Colwell in the road.

The witness then testified that she looked around and, referring to appellant's car, said "It is getting closer," but she was unable to estimate the car's distance at that time. After the witness had made the remark above quoted, she testified that she took hold of Miss Colwell's left hand, and "I led her to the left a ways, and I thought she was following, and so I let go." The witness then walked to her left, to the east side of the road, to a position beside Miss DeGraves, who had previously left the cleared roadway, and was walking through the snow. The witness did not see the car strike Miss Colwell, but heard the impact, and through the windshield of the car saw the girl on the fender and the hood.

On cross-examination, the following occurred:

"Q. Could you answer, was there anything when you looked back and saw the car on the two occasions,

was there anything to indicate that the car was coming fast? A. No. Q. In fact, were you girls all playing some kind of a game, if the car got closer to you—just explain that to me; I never played that game; I don't know much about it. A. Well, Edith and I were in the middle of the road, and she said—

"THE COURT: (Interposing) A little louder, please.

"A. She said, 'Ten points if you stay in the middle of the road, if we stay in the middle of the road,' and I said, 'O. K., I will stay,' and then I looked around and saw it was getting closer, and I told her that, and that is when I took her hand.

"THE COURT: I didn't understand the first part of that.

"MR. BOUNDS: Read that, will you, please (addressing the reporter.)

"A. (read by reporter) 'She said, "Ten points if you stay in the middle of the road, if we stay in the middle of the road," and I said, "O. K., I will stay," and then I looked around and saw it was getting closer, and I told her that, and that is when I took her hand.' Q. Then when you took her hand, what did you and she do? A. Well, she followed me. Q. And then did you get out of the path of the car, both of you, before you let go of her hand, were you out of the path of the car? A. No; we were getting off the road, yes. . . .

"Q. Now, about where were you in relation to the center when Edith let go of your hand? A. When I let go of Edith's hand, we were about the middle here. Q. About here? A. Yes. Q. Now, that is about the middle of the left hand side? A. Yes. . . .

"Q. Now, going back a minute to this game, you said if you stayed in the road longer and as the car gets closer, if you stay when the car gets closer, does it mean so many points, or something like that? A. Well, ten points. Q. The closer a car gets, the one that stays the longest gets ten points? A. Yes. Q. You girls learned that up at summer camp or something that summer? A. I hadn't heard of it. Q. Did you just make it up? A. I don't know; I hadn't heard of it. Q. In other words, you were going to see how long you could stay in the road, how close the car could get to you before you got off? A. Yes. . . ."

On redirect examination, the witness testified:

"Q. After the first car had removed itself from the scene, was anything said by either you or Edith relative to a game or the ten points? A. In regard to the second car? Q. Yes. A. Edith said, 'Let's stay, ten points if we stay in the middle of the road,' and I said, 'O. K.' Q. Where were you and Edith when she said that? A. Oh, about a block, a little over a block, I guess or a block and a half down from the bridge. Q. Now, did she say that before or after you looked back and said, 'It is getting closer?' In other words, which remark was made first? A. She said that before I said, 'It is getting closer.' Q. Did she say anything at all after you said, 'It is getting closer?' A. No."

Barbara DeGraves, testifying concerning the condition of the road and the walk along the same, and concerning the events immediately preceding the accident, said:

"A. Well, we walked on further, and I got off to the left in the snow, and I wasn't paying very much attention to the kids, and I heard Edith say, she said, 'I will stay if you will, Nadine,' and Nadine laughed and said, 'O. K.,' and we walked on, and I wasn't looking at them, I was looking at the snow, and I looked up in time to see—they were more or less going over to the left, and I looked up in time to see them separate and— (witness commences to cry). Q. Approximately how far did you walk from the time you heard Edith say, 'I will stay if you will,' until Edith was hit? Could you estimate the lapse of time between those two events? A. No, I can't. Q. Had you heard anything said about ten points or any game? A. I don't remember that. Q. You did not participate in any game yourself? A. No, I wasn't paying much attention. Q. Did you ever hear Nadine or anyone say, 'The car is getting closer?' A. No. Q. Approximately where were you at the instant Edith was hit? A. I was there by Church's house? Q. By Church's house? A. By Church's house, yes. Q. And was Edith to the south or to the north of you at that instant? A. Nadine and Edith both, when the car came they separated, and I

remember Edith running, and she was ahead and more or less this way. Q. She was running; which way was she running? A. She was running to the right of me, kind of cross-wise of the road. Q. Was she running straight across the road or at an angle? A. At an angle. Q. Diagonally? A. Yes. Q. And how long after you saw her running was she hit? A. Well, I looked up in time to see her going across the road, and she was running on an angle, and, well, then, the car just—just hit her, it didn't seem—(Witness hesitates)

"THE COURT: Was it just a matter of a second or two?

"A. Well, it only seemed to take a little time. She got across; I saw her running before the car hit her. Q. How many steps did you take during the time when you first saw her running until she was hit? A. I don't know; I just remember seeing her hit, and then I ran across the road. Q. That is, you ran over across to where she was? A. Yes."

On cross-examination, the witness testified:

"Q. Now, you say you saw—I am not going to keep you here very long, I know it is embarrassing—you saw the girl Edith running, did you? A. Yes. Q. Running in front of the car? A. Yes. Q. And she got across and the right side of the car hit her? A. Yes. . . . Q. Now, did the car, as you saw it, Miss Barbara, did the car seem to be going fast or slow? A. Well, it just seemed to be going moderately slow, it didn't seem to be speeding, and it wasn't going too slow. Q. You heard Edith say, 'I will stay in the road if you will,' and Nadine said, 'O. K.'? A. Yes. Q. Now, did you hear either one of the girls say anything else? A. No, not as I remember of. Q. Then you saw the girls get off, and after they got off this road where the car was could you see them separate? A. Well, they weren't entirely off the road when they had separated. Q. Well, they had started off the road when they separated? A. Yes. Q. And then Edith turned around and ran directly in front of the oncoming car, diagonally across? A. Yes—well, they both started this way (indicating to the left), and then they

separated and went like this, and Edith ran across. Q. Now, was there anything towards the Nygaard car that would prevent Edith from seeing the Nygaard car coming if she had looked? Could she have seen the Nygaard car if she had looked? A. Yes."

On redirect examination, the witness testified that appellant's car, as it approached, was closer to the right hand side of the road than to the left.

Miss Irma Klampher testified, in part, as follows:

(On direct examination) "Q. Did you see Edith when she was hit? A. No. Q. Did you see her actually hit? A. No, not actually hit. Q. Where was Edith the last time you saw her before she was hit? A. I saw her and Nadine walking off the road or starting off, and I thought they would get off, and I didn't pay much attention to them. Q. Just exactly where was Edith the last time you saw her with reference to the middle of the road? A. Well, she was just starting from the middle of the road to walk over to the left. Q. Just starting? A. Yes. Q. And then you didn't see her after that? A. Yes. Q. How far from the middle of the pathway, the middle line of the pathway would you say she was when you last saw her? A. I just saw her back a couple of steps from there. . . .

(On cross-examination) "Q. Now, do you know who said, 'The car is coming?' A. I couldn't say for sure. Q. Was it loud enough so all of you could hear? Could you all hear? A. Well, I heard it distinctly. . . . Q. And you saw Nadine and Edith holding hands and walking away from the path of the car, going west? A. Well, I just saw them start. Q. You said you saw them take about two steps? A. Yes. Q. And you said you saw Edith let go—A. (interposing) No. Q. You didn't see that? A. No. Q. Was there anything to indicate to you when you saw them walking away that Edith was going to turn around and go the other way? A. No, I was perfectly confident that she would follow. Q. There was nothing to indicate that she was going in front of the car? You thought she was going with Nadine? A. Yes."

After that, Miss Helen Michaels testified that she heard Miss Cargo call attention to the fact that appellant's car was approaching, and that the witness then looked back and saw the car, which was then about a block distant.

Charles Gehlen, a lad thirteen years of age, testified that, at the time of the accident, he was standing on the railroad right of way, at an elevation above the road, near the overhead viaduct which crosses the road at an angle a short distance south of the place of the accident, and that he had a clear view of the collision. He testified on direct examination:

"Q. What attracted your attention to anything unusual off there? A. Well, I heard one of the girls scream, and I turned around, and I saw this Colwell girl running in front of the car. Q. Just where was the girl with reference to the side of the road, Charles? A. She was just—well, just about in the middle, I would say, or a little to the right. Q. As near as you can say, the middle? A. Yes. Q. Could you tell the speed of the car? A. No, I don't think I could tell the speed. It must have been going between fifteen and twenty miles an hour. . . . Q. Did you see Edith at the instant the car hit her? A. Yes, she was running in front of the car, and then the car hit her. Q. And what happened then? A. Well, she seemed to fall over the fender, and then off to the side. Q. Do you know about her position on the highway at the time she was hit, about how far—first, do you know where that road comes in from the east into the main highway? A. Yes. Q. Well, with reference to where that road ends, where was the front of the car and where was Edith at the instant she was hit? A. Well, they must have been a little bit north of that road that turns into the side. Q. Do you know how long she remained on the car? A. Not more than fifteen feet maybe. Q. And then she fell off? A. Fifteen or twenty feet and then she fell off to the right of the road. Q. Did the car stop then? A. Yes, it came to a stop down about where the pavement ends, about between there and the viaduct there where the pavement ends."

On redirect examination, he testified:

"A. When I first saw the car it must have been right in about here where I saw it, because it wasn't where the girl was hit. It was right after I saw the girl, and she was running in front of the car.

"THE COURT: I want to be sure I understood something. Did you say you saw a girl running?

"A. She was running, yes."

On recross-examination: "Q. She was running in front of the car, was she, Charles? A. Yes."

While the testimony is not always clear, the record contains few contradictions. There is some dispute as to the speed of appellant's car some distance back of the point of collision, but little difference in opinion as to its speed at the time it struck Miss Colwell. Appellant's testimony as to the distance the car went after striking Miss Colwell and before she slipped off the fender into the snow, is contradicted, as is his testimony as to the distance his car went before it stopped. Some of the witnesses placed his car further from the west margin of the open roadway than he did, but this difference is not very great. In this opinion, we do not consider appellant's testimony save as it is corroborated by other evidence. In any event, appellant was driving on an open road, not exceeding any speed limit, and enjoying the right of way over pedestrians who were also occupying the road. Rem. Rev. Stat., Vol. 7A, § 6360-101 [P. C. § 2696-865].

Appellant saw the girls clearly, and they saw his car approaching for some time prior to the collision, and appellant knew that the girls were advised of his approach. Under these circumstances, a blast of appellant's horn would have added nothing to the girls' knowledge of the situation.

The so-called "game" suggested by Miss Colwell amounted, in effect, to a dare to Miss Cargo as to which of the girls would longer remain in the position of dan-

ger. Beyond question, Miss Colwell was grossly negligent in deliberately remaining in a dangerous position, and the trial court properly so found.

The only question to be determined is whether or not the doctrine of the last clear chance should be applied, and if so, whether appellant should be held responsible under that doctrine.

The trial court found that Miss Colwell was never at any time on the east side of the roadway. As we view the evidence, this finding is directly contrary to the preponderance of the evidence. Miss Cargo testified, as above quoted, that, when she let go of Miss Colwell's hand, the girls were about in the middle of their left hand, or the east, side of the cleared roadway. Miss Colwell had been walking approximately in the middle of the road, and Miss Cargo testified that, when she took Miss Colwell's hand, Miss Colwell followed her, evidently toward the east margin of the road, and that the two girls "were getting off the road." Miss DeGraves testified that she remembered Miss Colwell running toward the right, diagonally across the road and in front of appellant's car. Miss Klampher testified that she saw the Misses Cargo and Colwell "walking off the road, or starting off," and that she saw Miss Colwell just starting from the middle of the road to walk over to the left, and that she saw her back a couple of steps from the middle line of the pathway. As the cleared roadway was from ten to twelve feet in width, each half would be five or six feet wide, and a couple of steps from the middle would take a person well over to the side of the cleared way.

From the record, we are convinced that Miss Colwell, contrary to the trial court's finding, just prior to the accident was on the east half of the roadway and in a position of comparative safety. Appellant was justified in proceeding as he did, relying both upon the

right of way which the law gave him, and upon the fact that he knew the girls were aware of his approach, evidenced by the facts that he had seen several of the girls look back at his car, and that he saw first three and then one more accord him that right of way. The evidence is clear that Miss Cargo and Miss Colwell veered toward the east and proceeded a step or so, giving every indication that the two girls would together leave the roadway by way of its eastern boundary, as Miss Cargo did.

The testimony of Charles Gehlen is not entirely in accord with the testimony of the four girls, as no one of the latter testified that anyone screamed until Miss Colwell was struck. Charles testified that he heard a scream, and upon turning around, saw Miss Colwell running in front of the car. His testimony appears candid and truthful, and of course it is possible that one of the girls may have screamed upon seeing Miss Colwell run to her right and in front of the car. That is not important as affecting appellant's legal responsibility for the accident. Charles stated positively that he saw Miss Colwell running in front of the car. This testimony, considered with that of the witnesses above quoted, shows that Miss Colwell did, in fact, from some point east of the center of the roadway, suddenly turn and run toward the west margin of the road and directly in front of appellant's car.

In 5-6 Huddy's Cyc. of Automobile Law (9th ed.), 14, § 3, is found the following:

"A motorist may assume and act on the assumption that a pedestrian will exercise ordinary care to avoid injury, but he is not required to assume that pedestrians, using the highway in front of him, will not exercise care for their own safety, or that such persons have insufficient intelligence and discretion to do so."

In the case of *Moeller v. Packard,* 86 Cal. App. 459, 261 Pac. 315, the district court of appeal of California

affirmed a judgment rendered in favor of the defendant by the trial court sitting without a jury, in an action by a parent to recover damages for the death of a minor daughter. The case cited differs on the facts from the case at bar, as the injured child was only eight years of age, and from a position of safety on the street, but off the paved portion thereof, ran back on the pavement, where she was struck and mortally injured by the defendant's car. It was argued by the plaintiff and appellant that the defendant should have sounded his horn, that he was traveling at a rate of speed which, under the circumstances, was too rapid, and that the doctrine of last clear chance was applicable. The court held that the plaintiff could not be held negligent for having failed to sound his horn, that his speed under the circumstances was not excessive, and that the doctrine of the last clear chance should not be applied. The court assumed that the injured child ran on to the pavement when the automobile was approaching at a distance of thirty or forty feet, and that, in swerving his car to the left in an endeavor to avoid striking the child, the defendant adopted what appeared to be the best course, under the circumstances. The court used language almost identical with that above quoted from Huddy.

This rule is particularly appropriate to the facts in the case at bar. Persons eighteen years of age should be held to the exercise of the same judgment and discretion in caring for their own safety as persons more advanced in years. While the driver of an automobile, observing an eight year old child walking by the side of a paved roadway, might anticipate some sudden movement on the part of the child which would change the situation, a motorist seeing an eighteen year old girl start to leave a dangerous position on a

narrow roadway and proceed toward a place of safety, would not anticipate that the young lady would suddenly turn and run back into the path of the automobile, which was proceeding on its proper side of the roadway.

█ The opinion of this court in the case of *Hartley v. Lasater*, 96 Wash. 407, 165 Pac. 106, should be considered in connection with the case at bar. In the case cited, a judgment rendered upon the verdict of a jury in favor of the plaintiff was reversed and the cause remanded for new trial because of error in law committed by the trial court, which instructed the jury upon the doctrine of last clear chance. It appeared that the plaintiff on a motorcycle was proceeding south on a highway, followed by defendants in an automobile. The plaintiff was to the right of the center of the road, the defendants to the left. The plaintiff suddenly turned to his left and attempted to cross the road in front of the automobile, with the result that a collision occurred, resulting in the plaintiff's injuries. The trial court instructed the jury concerning the last clear chance, and this court, while holding that in the abstract the instruction was correct, observed that the accident happened so quickly that the defendants had neither time nor opportunity to act upon the last clear chance. Concerning this matter, the court said:

"Last clear chance implies thought, appreciation, mental direction, and the lapse of sufficient time to effectually act upon the impulse to save another from injury, or the proof of circumstances which will put the one charged to implied notice of the situation."

The court further observed:

"A mere statement of the rule reveals its inapplicability to a case where the contributory negligence began and culminated without the lapse of appreciable

time. The doctrine is not applied where the negligence is concurrent."

The case of *Lee v. Gleason Co.*, 146 Wash. 66, 262 Pac. 133, is to the same effect.

In the case of *Shanley v. Hadfield*, 124 Wash. 192, 213 Pac. 932, this court affirmed a judgment rendered in favor of the defendant, notwithstanding the verdict of a jury, in an action for personal injuries. It appeared that the plaintiff, while crossing a highway, was struck by a stage. It was held that, under the facts shown, the driver of the stage, when the accident became imminent, could have done nothing more than he did, and that no last clear chance to avoid the accident was afforded.

In the recent case of *Warner v. Keebler*, 200 Wash. 608, 94 P. (2d) 175, it was argued that, assuming negligence on the part of the defendants, the doctrine of the last clear chance should operate in their favor. On this phase of the case we said:

"If either branch of the last clear chance rule is applicable herein, it must be the first part, for the negligence of appellants occurred just prior to, and continued up to, the time of the accident. We do not think, under the facts in this case, the rule is applicable. There is no testimony which indicates that respondent E. C. Warner actually saw the peril of appellants until it was too late to avoid the collision."

Respondent cites many authorities in which the doctrine of the last clear chance was applied in favor of an injured person who had been guilty of negligence. In the case at bar, we hold that, as in the last two cases cited, the doctrine should not be applied, as when Miss Colwell ran in front of appellant's car, appellant was afforded no opportunity to do anything to avoid striking her.

The evidence preponderates against the findings of the trial court, and the judgment appealed from is ac-

cordingly reversed, with instructions to dismiss the action.

ROBINSON, C. J., SIMPSON, and JEFFERS, JJ., concur.

MILLARD, J. (dissenting)—The evidence does not preponderate against the findings of the trial court. The trial court found that, when appellant was approximately eighty feet behind the five girls, the two of them who were on the right or west side of the deceased walked into the snow bank on the west side of the pathway; the two girls who were on the left or east side of the deceased walked into the snow on the east side of the pathway; that one of the girls who was immediately left of the deceased took hold of the left hand of the deceased for the purpose of pulling her to the east side of the *pathway*, but that immediately she let loose of the hand of the deceased; and "That the deceased was never at any time on the east side of the said pathway." There is no evidence, except the unsupported testimony of appellant, that deceased moved, or intended to move, substantially away from the middle of the *pathway*.

An examination of the statement of facts will disclose that the road on which this accident happened was a straight road without hills or curves close to the point of accident. There was no walk for pedestrian travel. There were no obstructions to view. There was no traffic other than appellant's automobile at the time of the accident, or prior thereto, which could be a factor in this case. It was daylight and the weather was clear. The road was twenty feet wide but, as the testimony shows on page 23 of the statement of facts, the *pathway* used for travel on this highway in the center of this road was not wider than one and one-half times the width of the automobile which appellant was operating; that is, the way in the middle of the high-

way where the cars were travelling was from nine to twelve feet in width. East of that twelve-foot strip, conceding the roadway then used for travel was twelve feet wide, was a strip of highway four feet wide which was not used because of the snow. West of the used portion (which was not more than twelve feet wide) of the highway was a strip of pavement four feet wide which was not used because it was covered with snow.

The majority, in quoting a portion of the testimony, overlooked the fact that the evidence is that, when the one witness, whose testimony is determinative and was accepted by the trial court as true, last saw deceased, the latter was approximately in the *middle of* the *east half of* the *pathway*, which, it is not difficult to understand, would place deceased at least three feet west on the east half of the then used portion of the highway.

If the pavement is twenty feet wide, and four feet on the east side and four feet on the west side could not be used because of the snow and ice, one-half of the twelve-foot strip used for traffic would be six feet wide; that is, while the center of the highway would be ten feet from the east edge and ten feet from the west edge of the pavement, it should be borne in mind that the witness was talking about the twelve-foot strip used for traffic. The deceased was thirteen feet west of the east curb of the highway, or three feet west of the middle of the portion of the highway then open to traffic. In other words, the deceased was at all times in peril and her negligence never ceased from the time appellant first saw her until she was struck by appellant's automobile.

As the trial court observed, the girls upon the road were in a potential position of peril which appellant actually saw and which a reasonably prudent man would have understood. I agree with the trial court that it was appellant's duty to slow down to a safe

speed or to stop to avoid colliding with the girls. The situation is not one which arose suddenly. Had appellant slowed down to a proper slow speed, the deceased would have reached a place of safety, which was only three feet west of the place where she was walking and running. The trial court did not, nor do I, believe the testimony of the defendant that the deceased turned to her left, then turned back to her right. By her own negligence the deceased was placed in a position of peril and her negligence was continuing. Appellant actually saw the peril of approaching, at the speed he was travelling, one whose back was turned to him, and he had sufficient time in which to have prevented the accident had he approached the scene at a proper cautious speed.

It would serve no good purpose to cite our many prior opinions sustaining the view of the undersigned. The error of the majority is in rejecting the findings, which are amply supported by the evidence. No good purpose would be served in citing our many previous opinions that findings will not be disturbed unless it is made clearly to appear that the evidence preponderates against such findings.

The judgment should be affirmed.